IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

PAUL REED,                           )      Case No.  5:17cv2672
                                     )
          Petitioner,                )
                                     )      JUDGE JAMES S. GWIN
     v.                              )
                                     )      MAGISTRATE JUDGE
EDWARD SHELDON, Warden,              )      THOMAS M. PARKER
                                     )
          Respondent.                )
                                     )      **<u>REPORT AND RECOMMENDATION</u>**

## I.    Introduction

Petitioner Paul Reed filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions and sentences in *State v. Reed*, Case No. CR 2014 04 1179. [1] ECF Doc. 1.  Respondent Warden, Edward Sheldon, filed an answer/return of writ.  ECF Doc. 9.  Reed filed a traverse.  ECF Doc. 13.

On February 27, 2015, a jury found Reed guilty of one count of murder and one count of complicity to commit murder.  ECF doc. 9-1 at 12.  On March 13, 2015, after merging Reed's charges, the trial court sentenced Reed to serve a sentence of fifteen years to life.  ECF Doc. 9-1 at 13.  Reed is currently incarcerated at Mansfield Correctional Institution. [2]

---

[1]  The matter is before the undersigned by an automatic order of reference under Local Rule 72.2 for preparation of a report and recommendation on Reed's petition or other case-dispositive motions.
[2]  https://appgateway.drc.ohio.gov/OffenderSearch/Search/Details/A670329 (Last visited 8/28/19).

Because Reed's claims are procedurally defaulted, lack merit and/or present only noncognizable claims, I recommend that his claims be DISMISSED and his petition for writ of habeas corpus be DENIED.

## II.     Procedural History

### A.     State Conviction

On May 6, 2014, a Summit County Grand Jury indicted Reed on one count of aggravated murder (Count One), one count of complicity to commit aggravated murder (Count Two), and one count of obstructing justice (Count Four).  ECF Doc. 9-1 at 3-4.  Reed pleaded not guilty. ECF Doc. 9-1 at 6.

Before the trial began, the trial court dismissed the obstructing justice charge upon the state's recommendation.  ECF Doc. 9-1 at 7.  The jury found Reed not guilty of aggravated murder and complicity to commit aggravated murder but guilty of the lesser included offenses of murder and complicity to commit murder.  ECF Doc. 9-1 at 7.  On March 13, 2015, the trial court merged the charges and ordered Reed to serve an indeterminate sentence of fifteen years to life in prison.  ECF Doc. 9-1 at 13.

### B.     Direct Appeal

On April 13, 2015, Reed, represented by new counsel, filed an appeal in the Ohio Court of Appeals. ECF Doc. 9-1 at 14.   Reed's brief asserted four assignments of error:

First Assignment of Error:  Mr. Reed's convictions were contrary to the manifest weight of the evidence.  ECF Doc. 9-1 at 19.

Issue Presented:  Was the evidence presented such that reasonable minds could not reach different conclusions as to whether each element of the offenses had been proven beyond a reasonable doubt?  ECF Doc. 9-1 at 20.

Second Assignment of Error:  The jury verdict finding Mr. Reed guilty of murder was against the sufficiency of the evidence.  ECF Doc. 9-1 at 19.

Issue Presented:  Was the evidence presented by the State insufficient to prove every element of the charge?  ECF Doc. 9-1 at 20.

Third Assignment of Error:  The trial court erred in failing to grant Mr. Reed's motion for self-defense instruction in the jury instructions.  ECF Doc. 9-1 at 19.

Issue Presented:  Was there sufficient evidence presented at trial that the Trial Court should have included a self-defense instruction in the jury instructions?  ECF Doc. 9-1 at 20.

Fourth Assignment of Error IV:  The trial court's errors, when taken in their entirety, deprived Mr. Reed of a fair trial as guaranteed by the Fourteenth Amendment of the United States Constitution and Article I, Section Sixteen of the Ohio Constitution.  ECF Doc. 9-1 at 19.

Issue Presented:  Did the trial court's errors when taken as a whole deprive Mr. Reed of his constitutional right to a fair trial?  ECF Doc. 9-1 at 20.

On July 27. 2016, the Ohio Court of Appeals affirmed the judgment of the trial court.  ECF Doc. 9-1 at 60, *State v. Reed,* 9th Dist. Summit No. 27755, 27811, 2016-Ohio-5123.

Reed did not timely appeal to the Ohio Supreme Court.  On October 14, 2016, he filed a *pro se* motion for leave to file a delayed appeal with the Ohio Supreme Court.  ECF Doc. 9-1 at 76.  In his motion, Reed argued that counsel did not notify him of the decision of the Ohio Court of Appeals until August 8, 2016.  On December 14, 2016, the Ohio Supreme Court denied Reed's motion.  ECF Doc. 9-1 at 94.

## III.   Federal Habeas Corpus Petition

On December 13, 2017, Reed placed his *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the prison mailing system.  ECF Doc. 1 at 15.  Reed asserts three grounds for relief.

**GROUND ONE:**  Insufficient evidence to support the charges of murder and complicity to commit murder resulting in violation of appellant's fifth and fourteenth due process rights.  ECF Doc. 1 at 6.

**Supporting facts:**

1.  Although there was no physical evidence linking Petitioner Paul Reed with the homicide of the decedent, James Harris, he was convicted of Murder and Complicity to Commit Murder.

2.  On April 26, 2014, victim James Harris was killed at the appellant's home located at 914 Minota in Summit County, Ohio.

3.  At trial the State presented nineteen (19) witnesses, while defense counsel chose to present no witnesses for Appellant's defense.

4.  The decedent's son, Jabari Harris, testified that his father went to Appellant's residence to purchase a car.

5.  The State's star key witness, Ms. Kelly, testified that on the date of the killing, she met the victim in Appellant's driveway to show him to the car. (Tr. at 319).

6.  She then also testified that she led Mr. Harris to the basement of Appellant's residence. (Tr. at 221).

7.  There is no explanation on the record why Ms. Kelly would take the victim to the basement instead of to the garage where the only vehicle was parked.

8.  Although Ms. Kelly could not see what Mr. Harris was doing behind her, she testified that she ran out of the house when Harris was struck in the face with a stick by Appellant. (Tr. at 331).

9.  However, she also testified that she was in front of the victim and could not see what Mr. Harris was doing, or if there were any other individuals in the basement. (Id.)

10. Later in the trial, the State's forensic expert witness testified that their testing of the stick which Ms. Kelly said Appellant used to strike the victim did not have any DNA nor finger prints of Appellant on it.

11. Appellant was in the basement doing laundry when he heard the back door open.

12. When Appellant Reed approached the basement stairs, the first thing he saw was an arm and a hand with a gun in it coming around the corner at the bottom of the stairs.

13. The record supports the fact that the victim had a gun on his person.

14. Mr. Reed wrestled the victim to the floor in an attempt to get the gun away from him, while they both flailed away at each other.

15. After they exchanged punches, the victim eventually fell to the floor striking his head hard against the basement floor.

16. Appellant immediately asked his girl friend, Ms. Tiffany Powell, to call 911, which she did.

17. When the officers arrived at the scene very shortly after Ms. Powell called 911, they found the victim lying on his side bleeding from his head with his gun on the floor very close to his outstretched arm.

18. The officers also testified that Mr. Reed was sitting on the floor with his back leaning against the wall.

19. The crime scene photo of the victim which was shown to the jury confirmed the details in statements 17 and 18 above.

20. The record shows no evidence that Petitioner had invited the victim to his home.

21. When Petitioner saw a person with a gun coming down his basement stairs, he was understandably on the defensive to what looked like a home invasion.

22. Although there is substantial evidence that the victim was armed with a gun at the time of the incident, there was no evidence whatsoever, that Petitioner Reed was armed or that he had a gun in his possession or on his person.

ECF Doc. 1 at 18-20.

**GROUND TWO:** Trial court's failure to provide jury instructions with self-defense instruction violated petitioner's federal due process rights. ECF Doc. 1 at 8.

**Supporting facts:**

1. Petitioner Paul Reed herein restates all the Statements in Exhibit A to support Ground Two as if fully rewritten herein.

2. Defendant Reed, through counsel, had timely moved the trial court to provide a jury instruction regarding the affirmative defense of self defense.

3. The trial court refused to so instruct the jury.

4. The victim was not invited to Petitioner's home.

5. As supported by the evidence, the victim was armed with a gun and the Petitioner was unarmed.

6. Victim was an armed home invader who came into Reed's basement while he was doing laundry.

7. The loaded gun at the scene was found to belong to the victim and not Reed.

8. D.N.A. on the weapon was found to be Harris' and not the Petitioner's.

9. Under Ohio law, Reed did not have a duty to flee from his own home.

10. Petitioner maintains his innocence of the crimes he was convicted.

ECF Doc. 1 at 21.

**GROUND THREE:** The cumulative effect of the abuses of discretion by the trial court have resulted in several distinct and separate violations of petitioner's federal due process rights. ECF Doc. 1 at 9.

**Supporting facts:**

1. The Trial Court abused its discretion when it failed to give instruction of self defense, as there was clear and convincing evidence of this claim.

2. The Trial Court erred when it failed to declare a mistrial after an inconsistent jury verdict.

3. The Trial Court abused its discretion by sending the jury back for deliberations after returning the inconsistent jury verdict.

4. The Trial Court abused its discretion when it denied Mr. Reed's request for acquittal following the inconsistent jury verdict.

5. Petitioner Reed was denied a fair and impartial trial due to the cumulative errors at the discretion of the Trial Court.

ECF Doc. 1 at 22.

## IV.     Law and Analysis

### A.     Factual Background

We begin with a recitation of the facts found in the Ohio courts. The Ohio Court of

Appeals summarized the "jury trial at which the following evidence was offered":

> {¶ 2}   The Summit County Grand Jury indicted Reed on one count of
> aggravated murder in violation of R.C. 2903.01(A), an unspecified felony,
> and one count of complicity to commit aggravated murder in violation of
> R.C. 2903.01(A), 2923.03. The indictment arose from the murder of
> James Harris on April 26, 2014 after Reed plotted with his girlfriend,
> Tiffany Powell, to lure Mr. Harris to a residence on Minota Avenue where
> he was beaten to death. The matter proceeded to a jury trial at which the
> following evidence was offered.
>
> {¶ 3}   Powell has five minor children with Mr. Harris but, at the time of
> Mr. Harris's death, they were no longer in a relationship and Mr. Harris
> had custody of the children. Powell contacted Ro'ceeda Kelly, one of her
> friends, and offered to pay her $100 if she helped in a plot to lure Mr.
> Harris to the Minota Avenue residence. Powell said that the purpose of
> the plot was to entrap Mr. Harris into violating a civil protection order,
> which Powell said would help her regain custody of the children. Ms.
> Kelly agreed because she wanted Powell to have custody of the children.
>
> {¶ 4}   The plot called for Ms. Kelly to contact Mr. Harris and tell him
> that she wanted to sell a vehicle to him. Mr. Harris, a retired Marine who
> still worked on vehicles for resale, would then be instructed to meet Ms.
> Kelly at the Minota Avenue residence. Once he arrived, Ms. Kelly was
> supposed to lead Mr. Harris to the back entrance of the house and down to
> the basement. According to Ms. Kelly, neither Powell nor Reed
> mentioned to her what would occur once she went inside the house with
> Mr. Harris and she did not expect any violence. Instead, Reed simply told
> her that he would "take care of it."
>
> {¶ 5}   Reed drove his vehicle to pick up Ms. Kelly. Powell was seated in
> the front passenger seat with Reed. The three then drove to Mr. Harris's
> house so that Ms. Kelly could make her initial contact with him. Reed
> parked his vehicle around the corner from Mr. Harris's house so that it
> could not be seen. Ms. Kelly walked to the house, but Mr. Harris was not
> home. Rather, she spoke with one of his acquaintances who was at Mr.
> Harris's house to work on one of his other vehicles. She told the
> acquaintance about the vehicle she wanted to sell to Mr. Harris and then

returned to Reed's vehicle. The acquaintance told Mr. Harris about the offer upon his return to the house.

{¶ 6}   Reed, Powell, and Ms. Kelly drove around and made a couple of stops before Reed and Powell gave a Tracphone to Ms. Kelly and instructed her to call Mr. Harris and discuss the vehicle. Mr. Harris did not answer but he eventually called the Tracphone back and he arranged to meet Ms. Kelly later that evening at the Minota Avenue residence, which she said was her residence, pursuant to Powell's instructions. Ms. Kelly, Reed, and Powell then went to the Minota Avenue residence, parked around the corner so it could not be seen near the house, and they sat in the garage waiting for Mr. Harris to come. When Mr. Harris called Ms. Kelly, Powell told her what to say.

{¶ 7}   Mr. Harris attended a charity fundraiser before driving to pick his adult son up so that they could look at the vehicle together. Mr. Harris's son testified that he was unable to see any gun on Mr. Harris during their trip to the Minota Avenue residence and he indicated that he never knew Mr. Harris to have a firearm. Once they arrived at the residence around 10:15 p.m., Ms. Kelly was standing at the end of the driveway in front of the house and she told Mr. Harris to go to the back entrance since the carpets in the front room were wet from cleaning. Mr. Harris's son stayed in the vehicle, which was parked in the driveway.

{¶ 8}   Ms. Kelly testified that Mr. Harris was "nice" when he arrived and that she was unable to see a gun on him. Nevertheless, she led him to the back entrance of the house and then down the stairs to the residence's basement. After taking one step from the stairwell into the basement, Reed swung a pole and hit Mr. Harris in the face. This action scared Ms. Kelly, who was almost hit by the pole herself, and she immediately ran out of the house to the neighbor's yard.

{¶ 9}   Police were dispatched to the scene on a "fight call" and they were informed that a gun was possibly present. This dispatch was received shortly after Mr. Harris entered the residence. Upon their arrival on the scene, they discovered Mr. Harris's body as well as a gun that had one bullet in the chamber and a detached magazine close to it. The gun was discovered within arm distance of Mr. Harris's body and Mr. Harris's DNA was found on the magazine. Reed was present in the basement when police arrived and an analysis of his hands showed the presence of Mr. Harris's DNA. Powell was on the main level of the residence when police arrived. Both Reed and Powell were transported to the police station, where they gave "conflicting" accounts of the night's events. Moreover, both of them denied that Ms. Kelly was even present during the night's events, which police later disproved.

{¶ 10} The Summit County Medical Examiner performed an autopsy on Mr. Harris. She identified the cause of death to be blunt force trauma and the manner of death to be homicide. From the nature of Mr. Harris's various injuries to his face, neck, and back, the Medical Examiner concluded that it was likely that someone kneeled on Mr. Harris's back while "repeatedly" beating his head into the ground. Also, the Medical Examiner noted that there were no defensive wounds present on Mr. Harris's body and she opined that Mr. Harris's injuries were inconsistent with a scenario of mutual combat.

{¶ 11} Reed requested that the jury receive a self-defense instruction, but the trial court denied that request. The trial court did instruct the jurors on the lesser-included offenses of murder and involuntary manslaughter. The jury found Reed not guilty of aggravated murder and complicity to commit aggravated murder, but it found him guilty of the lesser included offense of murder and complicity to commit murder. After merging the convictions for sentencing, the trial court subsequently imposed an indefinite prison term of 15 years to life for Reed's murder conviction.

*State v. Reed,* 9th Dist. Summit No. 27755, 27811, 2016-Ohio-5123. These state court factual findings are presumed correct unless Reed rebuts them by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell,* 708 F.3d 760 (6th Cir. 2013).

**B.    Procedural Default/Exhaustion**

Warden Sheldon argues that all of the claims in Reed's petition are procedurally defaulted because he failed to file a timely appeal to the Ohio Supreme Court and the court denied his motion for a delayed appeal. *O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999). Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court can review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy,* 455 U.S. 509 (1982). This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan,* 526 U.S. at 845. In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander,* 912

F.2d 878, 881 (6th Cir. 1990). The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982). It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

A petitioner may procedurally default a claim by failing to "fairly present" the claim in state court and pursue that claim through the state's "ordinary appellate review procedures," if, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim. *Williams v. Anderson,* 460 F.3d 789, 816 (6th Cir. 2006) (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). Under these circumstances, although the exhaustion requirement is technically satisfied because a petitioner no longer has any state-court remedies available, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at 806 ("[When] state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "'petitioner must present his claim to the state courts as

a federal constitutional issue – not merely as an issue arising under state law.'" *Id.* (quoting

*Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).[3]

There is a second type of procedural default that is related to but "distinct" from the failure to exhaust. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). It occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim in the state courts while state remedies were still available. *See generally Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806. In determining procedural default, the federal court again looks to the last explained state-court judgment. *Ylst*, 501 U.S. at 805; *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).

When a state court declines to address a prisoner's federal claims because the prisoner failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). To be independent, a state procedural rule and the state courts' application of the rule must not rely in any part on federal law. *Id.* at 732-33. To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).

---

[3] Federal habeas courts review a petitioner's state-court briefs to determine whether he or she fairly presented a claim as a federal constitutional claim, examining the petitioner's:

"(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law."

*Williams*, 460 F.3d at 806 (citing *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)).

A preliminary finding that a claim has been procedurally defaulted does not end the court's analysis of the issue.  In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now-familiar evaluation district courts must make when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule.  Second, the federal court must determine whether the state courts actually enforced the state procedural sanction -- that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

Here, Reed did not file a timely appeal with the Ohio Supreme Court.  Rather, he filed a motion for a delayed appeal, which the Ohio Supreme Court denied.  Whether Reed's claims have been procedurally defaulted "turns upon whether the Ohio Supreme Court entry denying [his] motion for leave to file a delayed appeal constitutes a procedural ruling sufficient to bar federal court review of [his] habeas corpus petition."  *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004).  In *Bonilla*, the Sixth Circuit examined the applicable Ohio Supreme Court Rules relating to a motion for a delayed appeal and concluded that "the applicable Ohio court rules indicate that the denial of a motion for a delayed appeal is a procedural ruling, not a ruling on the merits."  *Id.*  And, when a state court is entirely silent as to its reasons for denying requested relief, federal courts assume that the state court would have enforced any applicable procedural

bar. *Simpson v. Sparkman*, 94 F.3d 199, 203 (6th Cir. 1996). Thus, the Ohio Supreme Court's denial of Reed's motion for a delayed appeal is considered a procedural ruling.

Failure to comply with the Ohio Supreme Court's filing deadline satisfies the first three prongs of the *Maupin* test. *Smith v. Ohio Dep't of Rehab. & Corr.,* 463 F.3d 426, 431-432 (6th Cir. 2006). Accordingly, Reed's petition must be dismissed as procedurally defaulted unless he can show cause and prejudice excusing the procedural default.

### 1. Cause for Procedural Default

Reed argues that he did not file a timely appeal to the Ohio Supreme Court because his attorney did not notify him that he had a 45-day time limit to file his appeal to the Ohio Supreme Court. ECF Doc. 13 at 11. The undersigned is not persuaded by this argument. Reed filed his motion for delayed appeal (ECF Doc. 9 at 77) more than 45 days after his attorney notified him of the state court of appeals' decision in a letter dated August 8, 2016. Nor can Reed rely on his *pro se* status or ignorance of the law and procedural requirements for filing an appeal to the Ohio Supreme Court as sufficient to constitute cause. *See Bonilla*, 370 F.3d at 498; *Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir. 1995); *Kimble v. Gansheimer,* No. 4:08CV1048, 2009 U.S. Dist. LEXIS 113160 at *30-31 (N.D. Ohio Dec. 4, 2009). Reed's excuse that he was unaware of the 45-day time limit is not good cause to overlook his procedural default.

Reed also argues that he could not get his trial transcripts so he could "further preserve and litigate plausible issues with that his appellant attorney failed to raise on direct appeal." ECF Doc. 13 at 12. But this also is not good cause for failing to timely appeal to the Ohio Supreme Court because claims against Reed's appellate attorney had to first be raised in the state court of appeals in an application for reopening pursuant to App.R.26(B) – something Reed did not attempt. And, lack of access to a transcript is not good cause for failing to file a timely notice of

Supreme Court appeal because a lack of transcript does not prevent an applicant from filing timely notice of appeal. See *Smith v. Warden, Lebanon Corr. Inst.,* No. 3:06-cv-326, 2007 U.S. Dist. LEXIS 54718 (S.D. Ohio May 4, 2007); *State v. Houston*, 73 Ohio St.3d 346, 1995-Ohio-317 (1995); *see also State v. Sweeney*, 131 Ohio App.3d 765, 769 (1999) ("lack of access to various parts of the transcript does not automatically prevent applicants from filing a timely motion"). Moreover, Reed was not entitled to a free transcript in addition to the one that was filed in his direct appeal. *State, ex rel. Vitoratos, v. Walsh*, 173 Ohio St. 467 (1962), appeal dismissed, 371 U.S. 114, 83 S. Ct. 210, 9 L.Ed.2d 168 (1962). Simply put, Reed has not demonstrated cause. And, absent a showing of cause, the Court is not obligated to assess whether he suffered any prejudice. However, as the discussion of the merits of Reed's habeas claims demonstrates, Reed was not prejudiced by his inability to submit them to the Ohio Supreme Court.

### 2. Actual Innocence

A federal court may also review a procedurally defaulted claim, even in the absence of a demonstration of cause and prejudice, to correct "a fundamental miscarriage of justice," as when the petitioner is actually innocent. *Coleman v. Thompson,* 501 U.S. 722, 748, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991) (quoting *Engle v. Isaac*, 456 U.S. 107, 135, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982)). An example of an actual innocence case is where the State has convicted the wrong person of the crime. *See Sawyer v. Whitley*, 505 U.S. 333, 340, 112 S. Ct. 2514, 120 L. Ed. 2d 269 (1992). This is not an actual innocence case.

It is well-established that "'[a]ctual innocence' means factual innocence, not mere legal insufficiency." *Carter v. Mitchell*, 443 F.3d 517, 538 (6th Cir. 2006) (citing *Bousley v. United States*, 523 U.S. 614, 623, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998)). For a petitioner to state a

claim for "actual innocence," that petitioner must present new evidence to the habeas court. *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 427 (6th Cir. Ohio 2003). This "new evidence [will] not rise to the standard of establishing his actual innocence [if] a reasonable juror still could have found [petitioner] guilty [beyond a reasonable doubt] even after considering [the] new evidence." *Jells v. Mitchell,* 538 F.3d 478, 507 (6th Cir. 2008). New evidence cannot excuse procedural default except when that evidence is "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Sellers v. Ward,* 135 F.3d 1333, 1338 (10th Cir. 1998) (citing *Schlup v. Delo*, 513 U.S. 298, 324, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)). New evidence, consequently, can only excuse procedural default in "extraordinary" cases. *Carter,* 443 F.3d at 538.

　　In his habeas petition, Reed submits new facts and challenges to the evidence admitted at his jury trial. ECF Doc. 1 at 20-24. Warden Sheldon argues that the court cannot consider Reed's statements because they were not submitted as evidence at trial. He cites *Cullen v. Pinholster,* 563 U.S. 170, 182 (2011) which limits habeas review to the record before the state court. But several courts have held that *Pinholster* does not apply to extra-record evidence in considering whether a habeas petitioner has met the gateway actual innocence standard set forth in *Schlup,* especially when it is used to excuse a procedural default of another claim. *See e.g., Fortson v. Eppinger,* No. 1:15 CV 2078, 2016 U.S. Dist. LEXIS 184080 (N.D. Ohio November 21, 2016); *Vinson v. Mackie*, 2016 U.S. Dist. LEXIS 154630, 2016 WL 6595021 at * 1 (E. D. Mich. Nov. 8, 2016) ("While neither the Supreme Court nor the Sixth Circuit have yet resolved the issue, lower courts that have addressed the question have unanimously held that *Pinholster's* limitation on new evidence does not apply to claims of actual innocence, especially when it is

used to excuse a procedural default of another claim.") (collecting cases); *Campbell v. Warden, London Correctional Institution,* 2015 U.S. Dist. LEXIS 160262, 2015 WL 7710761 at * 5 (S.D. Ohio Nov. 30, 2015) ("Campbell argues *Pinholster* does not apply to prevent consideration of new evidence to . . . show actual innocence to excuse a procedural default. This Court agrees. *Pinholster* only addresses admission of new evidence on the question to be decided under 28 U.S.C. § 2254(d)(1) and (2)"); *Jackson v. Warden, Lebanon Correctional Inst.,* 2014 U.S. Dist. LEXIS 110700, 2014 WL 3899292 at * 3 (S.D. Ohio Aug. 11, 2014) ("Under *Pinholster*, [the new evidence] cannot be considered in deciding the question presented by 28 U.S.C. § 2254(d)(1), but the Court can consider [it] in determining whether Jackson has met the *Schlup* gateway innocence standard."); *Clemmons v. Warden, Lebanon Correctional Inst.,* 2012 U.S. Dist. LEXIS 146029, 2012 WL 4811122 at * 8 (S.D. Ohio Oct. 10, 2012) ("However, *Pinholster* does not by its own terms apply to the actual innocence exception to either procedural default or the statute of limitations. The premise of the actual innocence exception is that the habeas petitioner is presenting new evidence not considered by the state courts. Nothing in the AEDPA purports to limit what new evidence a petitioner can present on that question."). *See also Gordon v. Turner,* 2015 U.S. Dist. LEXIS 84899, 2015 WL 3969689 at * 6 (N.D. Ohio June 30, 2015) (in evaluating motion to expand record, court "shall evaluate whether the proposed exhibit is relevant to either the timeliness of the petition or whether Petitioner can demonstrate equitable tolling or actual innocence").

In considering whether Reed is actually innocent, the court must consider "all the evidence, old and new, incriminating and exculpatory," without regard to whether it would necessarily be admitted under the rules of evidence. *House v. Bell,* 547 U.S. 518, 538 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006). (quoting *Schlup,* 513 U.S. at 331-32) (internal quotation marks

omitted).  Based on this total record, the court must make "a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* (quoting *Schlup*, 513 U.S. at 329). "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.* This standard is demanding and permits review only in the "extraordinary case." *Id.* (quoting *Schlup,* 513 U.S. at 327).  The petitioner's burden at the gateway stage is to demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *Id.*

 First, the court notes that none of the new facts Reed submits in support of his petition are actually new evidence.  Rather, they seem to be his version of the events that would have been submitted to the jury if he had chosen to testify.  In other words, these facts existed at the time of Reed's trial and he was already aware of them.  But Reed exercised his right not to testify and he doesn't argue that he was prevented from testifying.[4]  Even so, as long as the evidence relied on was "not presented at trial," it may be considered "new," for purposes of showing actual innocence, irrespective of whether Reed acted with reasonable diligence in discovering it and pursuing relief.  *See Souter v. Jones*, 395 F.3d 577, 596 n.9, 601 n.16 (6th Cir. 2005).  In *Souter*, the court expressly declined to impose temporal limitations on the sort of evidence that may be considered "new."  This understanding was reaffirmed in *Perkins v. McQuiggin*, 670 F.3d 665, 672-75 (6th Cir. 2012) and *Freeman v. Trombley,* 483 F. Appx 51, 57 (6th Cir. 2012).  The age of the information and the timing of its submission may be considered, though, in assessing its reliability. *See House,* 547 U.S. at 537.

---

[4] Rather, Reed argues that the State should not be able to use his silence against him.  ECF Doc. 13 at 14-15.

Some of Reed's supporting facts come from evidence that *was* submitted at trial. But he also states the following "new" information in support of his claims:

FACTS IN SUPPORT OF GROUND ONE

11. Appellant was in the basement doing laundry when he heard the back door.

12. When Appellant Reed approached the basement stairs, the first thing he saw was an arm and a hand with a gun in it coming around the corner at the bottom of the stairs.

14. Mr. Reed wrestled the victim to the floor in an attempt to get the gun away from him, while they both flailed away at each other.

15. After they exchanged punches, the victim eventually fell to the floor striking his head hard against the basement floor.

16. Appellant immediately asked his girl friend, Ms. Tiffany Powell, to call 911, which she did.

17. When the officers arrived at the scene shortly after Ms. Powell called 911, they found the victim lying on his side bleeding from the head with his gun on the floor very close to his outstretched arm.

21. When Petitioner saw a person with a gun coming down his basement stairs, he was understandably on the defensive to what looked like a home invasion.

FACTS IN SUPPORT OF GROUND TWO

4. The victim was not invited to Petitioner's home.

5. As supported by the evidence, the victim was armed with a gun and the Petitioner was unarmed.

6. Victim was an armed home invader who came into Reed's basement while he was doing laundry.

ECF Doc. 1 at 20-22.

In considering this "new" information, there are two questions the court must answer: 1) could a reasonable juror still have found Reed guilty beyond a reasonable doubt even after considering this new evidence; and 2) is this "new evidence" so strong the court cannot have

confidence in the outcome of the trial?  The answer to the first question is yes and the answer to the second question is no.

A reasonable juror could have still found Reed guilty beyond a reasonable doubt based on the testimony of Ms. Kelly and Dr. Lisa Kohler, the Summit County Medical Examiner.  Ms. Kelly testified that Reed and his girlfriend asked her to lure the victim to Reed's house under false pretenses.  ECF Doc. 9-4 at 35-50.  She testified that she brought the victim into the basement at Reed's request.  ECF Doc. 9-4 at 56-59, 61-64, 69-74.  Thus, if the jury believed Ms. Kelly, it could also have chosen not to believe the new facts in Reed's petition.  And, Ms. Kelly's testimony was more consistent with the medical examiner's testimony regarding the victim's injuries.  Dr. Lisa Kohler testified that the victim had at least 15 injuries to his head and a fractured rib with no defensive type injuries to his hands.  ECF Doc. 9-6 at 107-108.  Defensive type injuries would have been expected if the victim had "flailed away" at Reed as Reed asserts in his supporting facts.  A reasonable jury could have still found Reed guilty even if it was aware of Reed's version of the events.  Accordingly, even if the facts in Reed's petition are considered "new evidence," they are not strong enough to undermine this court's confidence in the outcome of the trial.

Further, the statements in Reed's petition can be discounted because they are unverified statements that are generally unreliable.  Reed doesn't explain why he chose not to testify at trial.  But because of this choice his newly introduced facts were not subject to cross-examination or rebuttal by the state.  Reed is correct in asserting that he had a right to remain silent at trial.  However, because he did not subject these new facts to cross-examination and rebuttal, their reliability has not been tested.  Accordingly, even if the facts in Reed's petition are considered "new evidence," they do not undermine this court's confidence in the outcome of the trial.

Viewing the new facts from Reed's petition in the context of all the evidence, incriminating and exculpatory, this court cannot conclude that Reed has carried his burden of demonstrating that this is the rare, extraordinary case warranting an excusal of the procedural default. He has not shown that "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Freeman,* 483 F. App'x at 38, (quoting *Schlup,* 513 U.S. at 327).

Reed did not file a timely appeal with the Ohio Supreme Court and all of his claims are procedurally defaulted. He has not shown good cause for his procedural default. Nor has he met the burden of demonstrating that he is actually innocent. I recommend that each of Reed's three grounds for relief be dismissed as procedurally defaulted.

## C.     Merits Review

Though not necessary, in order to be of greatest assistance to the Court, I will proceed to consider the merits of Reed's arguments. Federal courts considering habeas petitions are permitted to address the merits before reaching a final conclusion on procedural default, particularly when the analysis of the claimed procedural default is complicated. *Hudson v. Jones,* 351 F.3d 212, 215 (6th Cir. 2003); *Bates v. Bell,* 788 F.3d 568, 573 (6th Cir. 2015).

### 1.     AEDPA Standard

A state habeas prisoner's claims for habeas corpus relief are governed by the Antiterrorism and Effective Death Penalty Act, *Pub. L. 104-132, 110 Stat. 1214* ("AEDPA"), which amended the habeas corpus statute by including a standard of review that gives significant deference to the decisions made by the state courts on the constitutional issues raised in a habeas corpus petition. *See Penry v. Johnson*, 532 U.S. 782, 791, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir.2008). AEDPA imposes a "highly deferential standard for

evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 154 L. Ed. 2d 279,(2002) (per curiam).

When the claim presented in a habeas corpus petition ***has*** been presented to and decided on the merits by the state courts, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts in light of the evidence that was presented. 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In applying this statute, the Supreme Court has held that" [t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable . . . an unreasonable application is different from an incorrect one." To obtain habeas corpus relief, a petitioner must show the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon*, 565 U.S. 23, 24, 132 S. Ct. 26, 181 L. Ed. 2d 328 (2011), quoting *Harrington v. Richter*, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."

*Harrington v. Richter*, 562 U.S. at 102-103 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n. 50, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment)). In short,"[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.*, quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007).

### 2. Ground One

Reed's Ground One claim asserts that there was insufficient evidence to support his convictions for murder and complicity to commit murder. ECF Doc. 1 at 6. Warden Sheldon argues that this claim lacks merit. Federal habeas review is available for insufficient evidence arguments. *Jackson,* 443 U.S. at 316; *In re Winship,* 397 U.S. 358 (1970); *Johnson v. Coyle,* 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders,* 894 F.2d 792, 794 (6th Cir. 1990)(*en banc*). States have the power to determine the elements of criminal offenses, *See Engle v. Isaac,* 456 U.S. 107, 119-120 (1982); *Jackson,* 443 U.S. at 324, but the Due Process Clause prohibits states from convicting "without proving the elements of that crime beyond a reasonable doubt." *Fiore v. White,* 531 U.S. 225, 228-229 (2001).

A habeas court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319. (Emphasis in original). "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the correct guilt or innocence

decision, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins,* 506 U.S. 390, 402 (1993).

Because both *Jackson* and AEDPA apply to Reed's evidence sufficiency claim, federal habeas review requires deference at two levels. "First, deference should be given to the trier of fact's verdict, as contemplated by *Jackson;* second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by [the] AEDPA." *Davis v. Lafler,* 658 F.3d 525, 531 (6th Cir. 2011)(quoting *Tucker v. Palmer,* 541 F.3d 652, 656 (6th Cir. 2008)). The Sixth Circuit has explained:

> When reviewing whether the state court's determination was "objectively unreasonable," this court necessarily engages in a two-step analysis. First, we must ask whether the evidence itself was sufficient to convict under *Jackson.* The inquiry ends if the panel determines that there was sufficient evidence to convict [the petitioner]. If we find that the evidence is insufficient to convict, we must then apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt.

*Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir. 2010). The Sixth Circuit has observed that "'[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Reed argues that there was insufficient evidence to prove that he committed murder or complicity to commit murder. ECF Doc. 13 at 16-17, 19-23. The last explained state court decision that considered Reed's evidence insufficiency argument rejected it, holding:

> {¶ 20} A sufficiency challenge of a criminal conviction presents a question of law, which we review de novo. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 1997 Ohio 52, 678 N.E.2d 541 (1997). In carrying out this review, our "function * * * is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

After such an examination and taking the evidence in the light most favorable to the prosecution, we must decide whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* Although we conduct de novo review when considering a sufficiency of the evidence challenge, "we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." (Internal quotation and citation omitted.) *State v. Jarvis*, 9th Dist. Lorain No. 14CA010667, 2015-Ohio-4219, ¶ 10.

{¶ 21} A sufficiency challenge is legally distinct from a manifest weight challenge. *Thompkins* at 387. Accordingly, when applying the manifest weight standard, we are required to consider the whole record, "weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340, 515 N.E.2d 1009 (9th Dist.1986). Courts are cautioned to only reverse a conviction on manifest weight grounds "in exceptional cases," *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 32, 6 N.E.3d 649, citing *Otten* at 340, where the evidence "weighs heavily against the conviction," *Thompkins* at 387.

{¶ 22} When applying these standards in this matter, we must consider the statutory elements necessary to sustain a murder conviction. R.C. 2903.02(A) relevantly provides that "[n]o person shall purposely cause the death of another[.]" "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

B. Sufficiency Challenge

{¶ 23} Reed's first basis for his sufficiency challenge is that the jury initially returned a guilty verdict on murder and a not guilty verdict on involuntary manslaughter, which is a lesser-included offense of murder. Based on these initial verdict forms, Reed argues that "[i]f the jury found th[at] Reed did not cause the death [of] the victim as was indicated in the [involuntary manslaughter] verdict form, it is unfathomable how he could have then purposely caused the death of the victim." This argument relies on a faulty premise as to what the jury actually determined. When the trial court noticed that the jury initially returned verdicts on both the murder and involuntary manslaughter offenses, it instructed the jurors to go back to the deliberation room and to decide whether Reed was guilty of murder. If they unanimously found Reed guilty of murder, then they were to leave

the verdict form for involuntary manslaughter blank. The jury did exactly that and returned to the courtroom with a verdict form stating that they found Reed guilty of murder and leaving blank the verdict form for involuntary manslaughter. As a result, the jury did not issue a verdict regarding the involuntary manslaughter offense and Reed has failed to carry his burden to demonstrate error. See App. R. 16(A)(7).

{¶ 24} Reed also challenges the sufficiency of the evidence for his conviction on the basis that there is "conflicting evidence and testimony." However, we are precluded from considering conflicting evidence or issues of credibility when engaging in a sufficiency analysis. *See Jarvis*, 2015-Ohio-4219, at ¶ 10. As a result, we likewise reject this basis for Reed's sufficiency challenge.

C. Manifest Weight Challenge
{¶ 25} Reed's manifest weight challenge appears to rest on two grounds: (1) that the weight of the evidence cuts against a finding that he was involved in the plot to lure Mr. Harris to the Minota Avenue residence, which indicates that he did not plan to kill Mr. Harris; and (2) that the weight of the evidence supports a finding that Reed acted in self-defense. We reject both of these arguments.

{¶ 26} Ms. Kelly testified extensively to Reed's involvement in the plot to lure Mr. Harris to the Minota Avenue residence. Although Powell, Ms. Kelly's friend, was the person who contacted her regarding the plot, Reed was involved throughout the day as the plan progressed. He drove the vehicle to pick Ms. Kelly up and he took her to Mr. Harris's house to first set up the meeting regarding the car sale. Reed told Ms. Kelly that he would handle the situation once Mr. Harris was lured inside of the residence. Reed drove Powell and Ms. Kelly to the Minota Avenue residence and stayed in the garage with them as they waited for Mr. Harris to arrive. The evidence overwhelmingly supports a finding that Reed was involved in the plot to lure Mr. Harris to the Minota Avenue residence and that he was even in charge of how to handle Mr. Harris once he reached the inside of the house.

{¶ 27} As to Reed's self-defense argument for his manifest weight claim, we note that in our resolution of the third assignment of error, we concluded that there was insufficient evidence to even support the issuance of a jury instruction on this point. While there was evidence that allowed an inference that Mr. Harris had a gun on his person, there was no evidence offered to indicate that he brandished the gun or that he engaged in mutual combat with Reed. Consequently, we conclude that Reed's conviction is not against the manifest weight of the evidence.

{¶ 28}  Accordingly, we overrule Reed's first and second assignments of
error.

*State v. Reed,* 9th Dist. Summit No. 27755, 27811, 2016-Ohio-5123.

As recognized by the Ohio Court of Appeals, there was sufficient evidence to convict
Reed of murder and conspiracy to commit murder.  Ms. Kelly testified that Reed was involved in
the plot to lure the victim to his house and that Reed said he would "take care of him" when she
got him there.  ECF Doc. 9-4 at 56-59, 61-64, 69-74.  The victim's death was caused by multiple
injuries to his head, one of which Ms. Kelly saw Reed administer.  The victim did not have any
injuries consistent with defending himself.  ECF Doc. 9-4 at 107-108.  The state court of appeals
applied the proper standard, deciding whether, "after taking the evidence in the light most
favorable to the prosecution," "any rational trier of fact could have found the essential elements
of the crime proven beyond a reasonable doubt."

The state trial court and court of appeals concluded that the evidence of murder and
conspiracy to commit murder was strong enough to convict Reed.  After reviewing the evidence,
I too find that it was sufficient to convict him of those charges.  But even if I disagreed with the
court of appeals' findings, I could not say that the Ohio Court of Appeals was "objectively
unreasonable" in concluding that a rational trier of fact could have found Reed guilty beyond a
reasonable doubt.  There was sufficient evidence produced at trial to convict Reed of murder and
conspiracy to commit murder.  As is further explained *infra*, the jury's confusion in completing
the verdict forms does not alter the sufficiency of the evidence analysis.  I cannot find that the
state court decision was contrary to or an unreasonable application of Supreme Court precedent.
Should the Court elect to decide Reed's Ground One claim on the merits, I recommend that it be
dismissed for lack of merit.

### 3.    Ground Two

Reed's Ground Two claim alleges that the trial court's failure to provide the jury with a self-defense jury instruction violated his federal due process rights.  Warden Sheldon argues that this claim is not cognizable, is lacking in merit and would be harmless error even if it could be considered error.  The warden argues that the state only considered and applied state law when it determined that the trial court had not erred in refusing to instruct the jury on self-defense. ECF Doc. 9 at 36, ECF Doc. 9-1 at 65.

The warden also argues that the Ohio Court of Appeals correctly found that the failure to give the self-defense jury instruction did not deprive Reed of his right to due process.  ECF Doc. 9 at 36-37.  The court of appeals held,

> {¶ 14} "A trial court has broad discretion to decide how to fashion jury instructions, but it must 'fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.'"  *State v. White,* 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 46, 29 N.E.3d 939, quoting *State v. Comen,* 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus.  In line with this requirement, jury instructions must "present a correct, pertinent statement of the law that is appropriate to the facts."  *Id.*  When determining whether the challenged jury instructions comply with this requirement, we review for an abuse of discretion. *State v. Norris,* 9th Dist. Lorain No. 14CA010699, 2015-Ohio-5180, ¶ 25.  An abuse of discretion is more than an error of judgment; it implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 5 Ohio B. 481, 450 N.E.2d 1140 (1983).  When applying the abuse of discretion standard, we may not simply substitute our own judgment for that of the trial court. *Pons v. Ohio State Med. Bd.,* 66 Ohio St.3d 619, 621, 1993 Ohio 122, 614 N.E.2d 748 (1993).
>
> {¶ 15} When reviewing the trial court's decision to not issue a self-defense instruction in this matter, we are mindful that self-defense is an affirmative defense and that the defendant has the burden of proving it by a preponderance of the evidence.  *State v. Cornwell,* 9th Dist. Wayne No. 14AP0017, 2015-Ohio-4617, ¶ 19, 48 N.E.3d 169, citing R.C. 2901.05(A).  In order to avoid criminal liability on the basis of self-defense, the defendant must prove the following:

"(1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that [he] was in imminent danger of death or great bodily harm and that [his] only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger."

*State v. Goff,* 128 Ohio St.3d 169, 2010-Ohio-6317, ¶ 36, 942 N.E.2d 1075, quoting *State v. Thomas,* 77 Ohio St.3d 323, 326, 1997 Ohio 269, 673 N.E.2d 1339 (1997). "The trial court is not required to instruct the jury on self-defense in every situation in which the presentation is attempted; rather, a trial court need only instruct the jury on self-defense if the defendant has introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable [jurors] concerning the existence of such issue." (Internal quotation and citation omitted.) *State v. Hatfield,* 9th Dist. Summit No. 23716, 2008-Ohio-2431, ¶ 8. With these principles in mind, we turn to Reed's argument.

{¶ 16} Reed first contends that he offered sufficient proof to establish that he was not at fault in creating the violent situation that led to Mr. Harris's death. Specifically, he argues that the evidence shows that only Powell was involved in developing the plot to lure Mr. Harris to the Minota Avenue residence. But, a thorough review of the record, and particularly Ms. Kelly's testimony, directly belies this argument. Ms. Kelly testified that Reed was involved in the plot throughout the day as he drove the vehicle to transport Ms. Kelly and he told her that he would "take care of" the situation once Mr. Harris was led inside. Moreover, Ms. Kelly indicated that immediately after taking one step away from the stairwell into the basement, she saw Reed strike Mr. Harris's face with a pole. Indeed, Ms. Kelly testified that Mr. Harris had no opportunity to react or take any aggressive action toward Reed before Reed hit him. *See State v. Melchior,* 56 Ohio St.2d 15, 21-22, 381 N.E.2d 195 (1978) (determining that there was insufficient evidence for self-defense instruction where the defendant went to the murder victim's apartment to steal the victim's money and stereo); *State v. Warner,* 9th Dist. Lorain No. 96CA006534, 2001 Ohio App. LEXIS 6109, 2001 WL 1155698, *2 (Sept. 21, 2001) (determining that trial court did not err by failing to give self-defense instruction since the defendant was at fault in creating the violent situation where he disobeyed the order of a corrections officer). Consequently, we conclude Reed failed to offer sufficient evidence that he was not at fault for creating the violent situation. *See State v. Nichols,* 4th Dist. Scioto No. 01CA2775, 2002-Ohio-415, 2002 WL 126973, *3 (Jan. 22, 2002) ("Ohio courts have long recognized that a person cannot provoke assault or voluntarily enter an encounter and then claim a right of self-defense.").

{¶ 17} Reed's second argument for the issuance of a self-defense instruction is that police recovered a gun with a bullet in the chamber from

the basement that was within Mr. Harris's arm distance.  Although the jurors could infer from this evidence that Mr. Harris had a gun on his person at the time of the incident, there is insufficient evidence to raise the possibility that Mr. Harris brandished the gun during a mutual combat scenario.  Rather, both Mr. Harris's son and Ms. Kelly testified that they never saw Mr. Harris with a gun before he went into the basement, where he was immediately hit before he could react.  And, the Medical Examiner indicated that Mr. Harris did not sustain any defensive wounds that suggested the occurrence of mutual combat.  In light of this whole quantum of evidence, we cannot latch onto the mere recovery of a gun at the scene to determine that the trial court abused its discretion by denying the self-defense instruction.  *Compare State v. Gillespie,* 172 Ohio App.3d 304, 2007-Ohio-3439, ¶ 19, 874 N.E.2d 870 (2d Dist.) (determining that trial court should have issued a self-defense jury instruction where the defendant testified that he saw the victim with a knife, did not hit the victim first, and fired his gun at the victim only after the victim came at him).

{¶ 18} In sum, the trial court did not abuse its discretion by denying Reed's request for a self-defense jury instruction.  Accordingly, we overrule his third assignment of error.

*State v. Reed,* 9th Dist. Summit No. 27755, 27811, 2016-Ohio-5123.

Supporting Warden Sheldon's argument that Reed's Ground Two claim is not cognizable is the fact that the state court of appeals relied exclusively on state law in deciding whether the trial court had erred in concluding Reed had met his burden of showing sufficient evidence for the self-defense instruction.  Claims alleging only violations of state law are not cognizable upon federal habeas review and must be dismissed on that basis unless a fundamental violation of petitioner's due process rights has occurred.  "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire,* 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers,* 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does

not lie for errors of state law."); *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process." (Citation omitted)).

Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988). Even if the state court made errors in the application of state law, no cognizable issue arises unless there has been a denial of fundamental fairness. *Wilson v. Sheldon*, 874 F.3d 470, 475 (6th Cir. 2017)

For the following reasons, there is simply no basis upon which to conclude that Reed was deprived of a fair trial because the jury was not given a self-defense instruction. The failure to give a requested self-defense instruction does not deprive defendant of his constitutional right to due process and a fair trial if the evidence produced during trial was insufficient to warrant such an instruction. *Allen v. Morris,* 845 F.2d 610, 617 (6th Cir. 1988) citing *Melchoir v. Jago,* 723 F.2d 486, 493 (6th Cir. 1983). In *Melchoir,* the Sixth Circuit stated,

> The question of whether there is sufficient evidence to warrant submission of an issue to the jury is a question of law based on the historical facts developed at trial. While a federal court may apply the law to a given set of facts as it deems appropriate, a presumption of correctness attaches to all underlying factual determinations made by a state court. *Sumner v. Mata,* 449 U.S. 539, 66 L. Ed. 2d 722, 101 S. Ct. 764 (1981). Accordingly, in assessing the evidence submitted as to self defense we presume that the factual scenario found by the state courts, and largely reproduced above, is accurate.

*Id.*

Reed argues that there was sufficient evidence at his trial to support giving the self-defense jury instruction. But much of the "evidence" he cites comes from his own interpretation of the events and the new "facts" he has attempted to submit in his petition. ECF Doc. 13 at 26-

28. He argues that the trial court improperly weighed the credibility of witnesses when determining that the evidence did not support a self-defense instruction. However, it does not appear that the trial court weighed the witnesses' credibility in making this decision. Rather, because neither Reed nor any other witnesses testified on his behalf, some of the evidence he now relies upon was simply not introduced at trial and was not available to the trial judge when deciding how the jury should be instructed. And in the context of a merits (as opposed to a procedural default) review, this court cannot consider that new information. *Pinholster*, 563 U.S. at 181-182. There is no basis on the record before us to conclude that Reed was deprived of a fair trial or any due process right.

Reed's Ground Two claim appears to rely only state law; his petition and traverse do not cite any clearly established federal law in support of his Ground Two claim. Thus, I cannot find that the state court decision was contrary to or an unreasonable application of Supreme Court precedent. Nor has Reed shown that the trial court's decision to deny his request for a self-defense jury instruction resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. In fact, by attempting to submit new facts in the arguments supporting this claim, Reed tacitly concedes that the evidence before the trial court was insufficient to support the requested self-defense instruction. I recommend that Reed's Ground Two claim be dismissed as lacking merit and/or because it is not cognizable.[5]

---

[5] Warden Sheldon also argues that, if the trial court erred in refusing to instruct the jury on self-defense, the error was harmless. This argument is not fully developed in the warden's return. And, because the trial court did not err in refusing to give the instruction, it is unnecessary to consider whether the asserted error was harmless.

### 4.    Ground Three

Reed's Ground Three claim asserts that the cumulative effect of the trial court's abuses of discretion resulted in several distinct and separate violations of his federal due process rights.

ECF Doc. 1 at 9.  Warden Sheldon argues that this claim is not cognizable on habeas review.  He also argues that Reed has failed to establish that the trial court made *any* errors.  It follows that there cannot be any "cumulative effect" of errors.  ECF Doc. 9 at 44-46.

Reed's traverse argues that the trial court made the following errors:

1. The trial court abused its discretion when it failed to give instruction of self-defense, as there was clear and convincing evidence of this claim.

2. The trial court erred when it failed to declare a mistrial after an inconsistent jury verdict.

3. The trial court abused its discretion by sending the jury back for deliberations after returning with an inconsistent verdict.

4. The trial court abused its discretion when it denied Mr. Reed's request for acquittal following the inconsistent jury verdict.

5. Petitioner Reed was denied a fair and impartial trial due to the cumulative errors at the discretion of the trial court.

ECF Doc. 13 at 28.

Reed asserts that the trial court erred in refusing to instruct the jury on self-defense.  As discussed above, this was not an error.  The evidence produced during Reed's trial was insufficient to warrant such an instruction.  *Allen,* 845 F.2d at 617; *Melchoir,* 723 F.2d at 493.

Reed's alleged errors two through four all relate to the jury signing verdict forms for both a murder charge and a lesser included offense of involuntary manslaughter.  As the Ohio Court of Appeals acknowledged, the jury initially returned a verdict form stating that Reed was guilty of murder and another form stating that he was not guilty of involuntary manslaughter.  *State v. Reed*, 2016-Ohio-5123 at ¶ 23.  Reed argued at trial and on appeal that the verdict forms were

32

inconsistent because "if the jury found th[at] Reed did not cause the death [of] the victim as indicated in the [involuntary manslaughter] verdict form, it is unfathomable how he could have then purposely caused the death of the victim." *Id.* However, after the jury returned both completed verdict forms, the trial court instructed that, if they unanimously found Reed guilty of murder, then they were to leave the verdict form for involuntary manslaughter blank. The jury then completed a new verdict form for murder, left the new form for involuntary manslaughter blank, and returned to the courtroom. Thus, after receiving a proper instruction from the court, the jurors completed the forms in accordance with their findings and the forms were no longer inconsistent with one another. Reed's argument related to the jury's initial misunderstanding of the verdict forms was properly rejected by the Ohio Court of Appeals. The properly completed jury forms were not inconsistent and the trial court did not err in sending the jury back for further deliberations after they initially returned inconsistent verdict forms. Nor did the trial court err in failing to declare a mistrial or in denying Mr. Reed's request for an acquittal following the inconsistent verdict forms.

Reed does not cite any clearly established federal law in his petition or his traverse in support of his Ground Three claim. I do not find that the state court's decision was contrary to or an unreasonable application of federal law. Nor has Reed shown that the manner in which the trial court handled the initially inconsistent verdict forms resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Reed has not shown that the trial court erred in any of its rulings. He has certainly not shown that cumulative errors resulted in a deprivation of his due process rights. Moreover, alleged cumulative, non-constitutional error claims are not cognizable on habeas review. *Williams*, 460 F.3d at 806, citing *Moore v. Parker,* 425 F.3d 250, 256 (6th Cir. 2005); *Cross v.*

*Stovall,* 238 F. App'x. 32, 41 (6th Cir. 2007). Should the court elect to decide Reed's Ground Three claim on the merits, I recommend it be dismissed as lacking merit and/or because it is not cognizable.

## V. Recommendation Regarding Certificate of Appealability

### A. Legal Standard

As amended by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2253(c)(1) provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further.'"" *Hicks v. Johnson,* 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson,* 97 F.3d 751, 755 (5th Cir. 1996)(quoting *Barefoot v. Estelle,* 463 U.S. 880, 893, n. 4 (1983)); *accord Slack v. McDaniel,* 529 U.S. 473, 483-484 (2000). The statute requires that certificates of appealability specify which issues are appealable. 28 U.S.C. § 2253(c)(3).

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of

appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks the requirement of § 2253(c)(3) that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a). In light of the Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, a recommendation regarding the certificate of appealability issue is included here.

### B. Analysis

Reed's claims are procedurally defaulted because he did not file a timely appeal with the Ohio Supreme Court and he has not shown either cause or prejudice to excuse the default. His habeas claims also lack merit as explained above. Reed has not shown any unreasonable applications of federal law or any unreasonable determinations of facts. Habeas relief is not available for the issues identified in his petition. This would not be not debatable among jurists of reason, and I recommend that no certificate of appealability issue in this case.

## VI.    Recommendations

Because all of Reed's claims are procedurally defaulted and lack merit and because his Ground Two and Ground Three claims raise only noncognizable state-law issues, I recommend that the Court DISMISS Reed's claims and DENY his petition for writ of habeas corpus under 28 U.S.C. § 2254. I further recommend that he not be granted a certificate of appealability.

Dated: August 29, 2019

Thomas M. Parker
United States Magistrate Judge

_____

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).